## SIMMEN AUTOMATIC RAILWAY SIG-NAL CO. v. GENERAL RAILWAY SIGNAL CO.
### Nos. 133–378.

Circuit Court of Appeals, Second Circuit.
July 23, 1934.

Burnita Shelton Matthews, Laura M. Berrien, and Rebekah S. Greathouse, all of Washington, D. C. (Olive Stott Gabriel, of New York City, of counsel), for plaintiff.

Clifton V. Edwards, of New York City, Hugh M. Morris, of Wilmington, Del., and Neil D. Preston, of Rochester, N. Y., for defendant.

L. HAND, Circuit Judge.

The plaintiff sued in equity to enforce specifically a contract between the parties, dated November 5, 1914. Simmen, the plaintiff's organizer, was an engineer, and a prolific inventor of automatic railway signal and braking devices; from him the plaintiff had acquired among other inventions, a patent, No. 941,541, issued, November 30, 1909, and two pending applications, on one of which, No. 439,334, a patent issued on August 17, 1915, No. 1,150,309; and on another, No. 427,080, five issued as follows: No. 1,150,308, August 17, 1915; No. 1,183,597, May 16, 1916; No. 1,266,871, May 21, 1918; No. 1,308,558, July 1, 1919; No. 1,568,775, January 5, 1926. The contract gave the defendant an exclusive license to sell devices "embodying any one or all of the inventions of the herein enumerated patents and applications, in so far as the same relates" (sic) "to speed control." The defendant agreed to pay $500 at once, and $49,500 more, at agreed dates on or before December 8, 1916; in addition it was to pay a minimum yearly royalty, or dead-rent of $10,000. The contract then proceeded as follows: "The licensee shall pay * * * a royalty of $50 * * * in respect of each 'complete unit equipment' * * * sold and supplied by or on behalf of the licensee * * * provided however that the excess over $10,000 only shall be payable under this paragraph in addition to the payment to be made in paragraph 3." Paragraph 3 was the dead-rent provision. The excess of royalties above the dead-rent in any year might be allocated to a deficiency in a previous year, so that the defendant would be liable at no time for more than $10,000 a year, unless the

sum of its royalties from the beginning was greater than the sum of the dead-rents. Express leave was given to grant sub-licenses with the written consent of the plaintiff; but they must be subject to all conditions of the agreement, "and all such sub-licenses shall provide for the royalties specified in paragraph 4." "Speed control" was defined as "any method of enforcing the proper speed control of a moving vehicle; provided, however, that nothing in this definition shall be so construed as to include the use of the cab signal alone." Similarly a "complete unit equipment" was "the smallest combination of parts placed on a moving vehicle that suffices to control or enforce the control or speed of said vehicle."

On September 6, 1927, the defendant with the written consent of the plaintiff granted a license to the Union Switch & Signal Company under the agreement just mentioned, but as of May 4, 1916; that company agreeing to render an account for all the unit equipments which it had sold theretofore. Under the terms of this agreement the Union company paid to the defendant between September 8, 1927, and September 8, 1930, $45,000, the royalty upon 900 equipments. This contract was the delayed consequence of a pooling agreement of May 4, 1916, between the defendant, the Union company and two other companies by which the defendant was to give the Union company such a license. This it had tendered in season, but the Union company had not accepted it within the time prescribed, and its right had lapsed. The defendant paid the $50,000 required, and the dead-rent on the eighth of every September from 1915 forward. The royalties which it admitted to be due under the contract up to September 8, 1930, were $66,300, and as the dead-rents paid were $160,000, there was $93,700 to the defendant's credit, equal to 1,874 units. The gravamen of the bill which asked for an accounting was two-fold: First, that certain devices made and installed by the defendant were within the contract in spite of its denial, and that it was liable for royalties upon them; second, that it was accountable for the royalties paid by the Union company under the license agreement of September 6, 1927, in addition to the dead-rents. The judge concluded that none of the disputed installations were within the contract, but that the defendant was liable for the royalties received from the Union company. He granted judgment for $45,000 and otherwise dismissed the bill. Both sides appealed.

As to the royalties paid by the Union company to the defendant, the plaintiff can proceed only on two possible theories: First, that the defendant is liable upon some express promise in the contract; second, that in collecting the money, it was in the position of an agent or trustee. The first is certainly untrue. The only promise to pay any royalties at all was to pay them upon units "sold and supplied by or on behalf of" itself. If the units sold by the Union company were supplied by the defendant, they were within the proviso of the fourth paragraph of the contract, and might be set off against the dead-rents; if they were not, it had not promised to pay any royalties on them at all. The second ground is equally without foundation. The contract gave leave to the defendant to grant sub-licenses, which should "provide for the royalties specified in paragraph 4 hereof." This meant more than that the royalties should be $50 each; the right to set them off against the dead-rent was a part of paragraph four, and was an incident of all royalties paid under a sub-license. Some point is made of the fact that the agreement was not expressly called a "sub-license," but in substance it was. It was the equivalent of the original offered by the defendant and refused by the Union company in 1916. But there is no mystery in the term, "sub-license." If the licensee is not an assignee, and the defendant was not one, he has merely an excuse for what would otherwise be a tort. We may agree that he cannot give anyone else a license; the defendant's only right to do so here arose from the specific power given it to sub-license, which was no more than a power of attorney from the patentee to excuse the tort. That throws not the least glimmer on whether the royalties were to be the plaintiff's or the defendant's; they might be either's, and both the text and the reasonable meaning of the transaction show that they must have been intended to go to the defendant. As to the text, the Union company expressly agreed to pay past royalties to the defendant, not to the plaintiff; if these belonged to the plaintiff it is incredible that this should have been done, for the plaintiff was a party to the contract. But if the past royalties were the defendant's, so were the future; certainly there was no change of intent between the two. There was no motive for the defendant to enter into the transaction on any other terms. Though the pooling agreement of May, 1916, had provided for a sub-license, that was eleven years before; the defendant had tendered it and the Union company had forfeited any right to it. The defendant was under no further duty; it had the field exclusively to

234

itself, and it had nothing to gain by allowing the Union company to enter. On the other hand it had much to gain in the amortization of its dead-rent which at the time had already caused it a loss of about $115,000. Nor was this an indifferent result to the plaintiff, which stirred up the sub-license. The defendant could denounce the contract at the end of any year; the strain of the mounting dead-rents was plainly a motive to discontinue; aside from that it was desirable to get the patented devices as widely used as possible. Therefore it seems to us clear that the purpose was to grant a sub-license in the stricter sense; that is, to carve out of the defendant's exclusive power to make, sell and use these inventions so far as they involved "speed control", an equal power to the Union company. This is one of the conventional advantages of an exclusive licensee, over which the patentee has no control, save when, as here, he reserves his consent. This covers of course not only the royalties which the judge awarded the plaintiff, but those other royalties not so awarded, which the plaintiff claims.

As to the royalties upon the sale of the disputed devices, the case turns on the meaning of the contract. Not every use of the described inventions was licensed, and only licensed uses carried royalties. The contract was very specific; the license was of devices which embodied the inventions "in so far only as the same relate to Speed Control." This limitation was several times repeated, and meant, as we have seen, "enforcing the proper speed control of a moving vehicle." It expressly excluded "the use of a cab signal alone." This last is of importance in view of the fact that one of the inventions licensed, No. 941,541, was exactly that, a patent for a cab signal; which was not therefore licensed generally but only when used in conjunction with one of the other inventions. That was indeed exactly the position which the plaintiff took regarding it in March, 1923. The contract formally included more than the two applications and patent, No. 941,541; the words were "or others becoming from time to time the subject matter of this license." Others probably did become subject to the license; the defendant so declared in the pooling agreement, and a long list of patents was appended by the plaintiff to its consent to the sub-license of 1927. The plaintiff argues from the disclosures of some of these that the phrase, "speed control," must be more broadly read; it does not argue that any of them covered the installations in dis-

pute. But as in the case of No. 941,541, a patent might have a proper place in the contract though the license covered it only, if it were used in conjunction with another invention. If a patent, not itself "enforcing speed control," could not be used in such conjunction, there would indeed be some force in the argument. One or two such were indeed added after 1914 and they should weigh in the scale, but they cannot turn it against the words chosen. As we shall see, neither of the challenged installations can possibly be "speed control," unless we are to disregard the plain intent of the definition. Therefore we may ignore any of the inventions except those recited in the contract. These were those disclosed in the pending applications; they were two. Each presupposed a railroad equipped with a block signal system; that is, one in which the blocks of track are normally energized by an electrical current, except when the block ahead is not clear. The inventions further presuppose a ramp, beside the track at the beginning of each block, energized and de-energized with the track. The locomotive carried a shoe which the ramp raised as the locomotive passed. The shoe was in a circuit (the "stick" circuit), in which was a solenoid that when magnetized opened another circuit which when closed in turn applied the brakes. Thus if the "stick" circuit was broken, the second circuit, the "brake" circuit, was closed and the brakes went on. However, any break in the "stick" circuit was supplied by the current in the ramp if there was any; that is, whenever the block ahead was clear; this was accomplished by another circuit not necessary to consider. As a consequence the brakes went on when the block ahead was not clear; so far both forms were alike.

In one form the "brake" circuit contained a second movable contact besides that controlled by the solenoid of the "stick" circuit. This second contact was broken or closed by the action of a governor which measured the speed of the train. When the speed got above the desired maximum the contacts closed and the "brake" circuit was completed, if the solenoid was de-energized. That circuit then set the brakes in a way not necessary to describe, except to say that they would be released as soon as the speed decreased enough to reopen the second contact. They could not bring the train to a stop unless the speed governor were set at zero, which would be equivalent to taking out the second contact altogether, and to mutilating the machine. This was the invention covered by the five patents resulting from application No. 427,-

080, mentioned in the contract. The second application, No. 439,334, called the "cam and governor" control, was of the same general kind; it differed in the way in which the brakes were applied and in fixing a maximum speed for the train at all times, even when the block ahead was clear. When it was not clear, the brakes were set until the speed reached a predetermined minimum; the result was a "tapering" speed, which means that the maximum speed possible after the train reached a "caution" block would be slowly reduced to the minimum. Again it was impossible to stop the train. The language of the contract now becomes plain; "speed control" meant something on the locomotive which checked, but did not stop, the train, independently of the will of the engineer; something with whose operation he could not interfere, except by keeping his train below the maximum speed. In patent 941,541, the engineer could indeed break the circuit, but to do so he must throw off the motive power of the train.

■ The installations which are supposed to fall within the license were of several sorts, the most important being the defendant's "Auto-Manual Control." In origin this was an alternative to automatic "speed control," treated as such by both the railways and the Interstate Commerce Commission. As will appear, it depended, unlike the inventions in suit, not in taking away from the engineer all power to run at dangerous speeds when the block ahead was not clear, but in making certain that he had seen any block signal set against him. It did nothing more than that, except that it stopped his train if he did not "acknowledge" the signal; it did not limit the speed of the train at all; it "enforced" no specific speed. Without going into details, this result was accomplished by providing a mechanism, partly on the track, partly on the locomotive, which set the brakes if the block ahead was not clear, unless the engineer threw a lever to forestall its action. If he did, the train passed on at undiminished speed. There was only a short period, fifteen seconds, within which his action was effective, timed to end just as the locomotive reached the signal. If he tried to forestall before that period began, his effort was abortive; if he failed to act before the brakes began to set, nothing he could do would prevent their full application; the train must come to a complete stop. But, whatever the conditions ahead, safe or dangerous, whatever the speed at which he was traveling, he was absolutely free; he might keep on, or slow down, or speed up, provided that within the critical interval he had taken the proper action.

After what we have said as to the meaning of the contract the differences between such a system and "speed control" have already appeared. There can be no reasonable question as to the two applications; these were meant to take out of the hands of the engineer any control over his train, unless he kept the speed below the maximum. They insured safety by an "enforced" limitation of speed. The "Auto-Manual" system did not "enforce" either a maximum or a stop; it did enforce attention and left the rest to human judgment. The means too were different; it is a misnomer to speak of "controlling" its speed when one stops a train. As to patent 941,541, we have already seen that unless incorporated with one of the applications it was not licensed, and therefore if an installation was not within the applications, it was not within the patent. Incidentally the defendant did not use it; it had no signal in the cab. Moreover the response of its brake-setting mechanism did not depend upon the speed of the locomotive. The judge was right in holding that the "Auto Manual Control" was not within the contract.

■ The defendant also installed 1,600 units on the New York Municipal Railway which the plaintiff asserts to be within the contract. It had for long been the custom in subways to set automatic trips alongside of the track which were raised if there was a train upon the block ahead; and when so raised, they would trip an arm or lever on the car which either communicated directly with the air-brake by opening the valve, or indirectly by means of electrical devices. Thus if the train entered a block against which a caution or stop signal was set, it would come to a full stop at once without any action by the engineer. This system was not however enough, if it was desirable to allow trains to enter a block against which a signal was set; and to meet this situation the defendant devised the system now in dispute, which provided for the usual set of block signals and track trips, with the following modification: If a train entered a block when the signal was set provisionally against it, as at "caution," in so doing it set in action electrical relays which at the end of a prescribed interval would drop the track trip at the entrance of the block ahead. The train must consume that interval, or it would reach the trip while the trip was upright and it would come to a full stop. If, however, it did consume the inter-

val, it could pass at whatever speed it chanced then to have; for the control was only of the whole time consumed in the block, not of the speed on leaving it.

This was "speed control" in the sense that the mechanism insured an average speed, as we have said; but it was neither what the contract meant by that phrase, nor was it within the inventions. We are not concerned with the claims allowed, for no claims could be drawn upon the disclosures which would cover this installation. The purpose and effect of the inventions were automatically to keep the speed below the proper limit; the engineer had nothing to do with this, though of course he could voluntarily keep below it, if he wished. If he tried to go faster he would be checked, but not stopped. In the apparatus we are now discussing, he would be stopped, but not checked; he could go as fast as he liked, leave the block indeed at full speed, if he had loitered enough at the beginning. Aside from this there was no "Complete Unit Equipment." The "parts placed on" the "moving vehicle" did not alone "suffice to * * * enforce the control of the speed of said vehicle." Of course it is true that the cars carried the lever and the associated circuits to operate the brakes, and obviously the brakes had to be on the cars. Furthermore it is true that the "parts" spoken of in the definition could not have been meant to include the block signal system and the ramp, and that these were essential to speed control. But in all the inventions the only parts not carried by the car were the well known ramp and the block signal currents. The ramp we may take as an equivalent of the track trip; it makes little difference whether a shoe be raised, or a lever be turned; but the timing mechanism was not carried by the car and that was certainly part of the apparatus which effected speed control, if there was any such control at all. For these reasons we agree with the judge that the installations on the New York Municipal Railway were also not within the contract.

There remain two other systems of safety devices on which the plaintiff insists that the defendant should pay royalty; one put on the New Haven Road, the other on the Buffalo, Rochester & Pittsburgh Railroad. Together these amount to less than fifty units, and as the case comes up the issue is moot. This is for the following reason: As we have said, on the last date at which the account appears in the record the defendant had "sold and supplied," all told including the Union Switch & Signal units only 1,326 units; it had paid for 3,200; it had a balance due

it of 1,874. At most we could do no more than declare that it should debit against the royalties credited to it those due on the two installations we have just mentioned. It is of course possible that the defendant may use up not only its credit of 1,874 units but also those that it will acquire if it keeps up the dead rents. But only in that event can it be more than a moot question whether it owes any royalties for the units we are now considering. Strictly indeed, the same argument applies also to the 1,600 units installed on the New York Municipal Railway; but as to these the margin was close and the possibility more real, and we felt that a decision was justified. It will of course be understood, however, that as to these few units the decree will not be res judicata. With that condition the bill must be dismissed.

Decree modified; bill dismissed.